## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MARYLAND, NORTHERN DIVISION

| | |
|---|---|
| VICTORIA MAY,<br>2005 Greyson Drive<br>Auburn, Indiana 46706 | Case No. 21-2229 |
|     Plaintiff, | |
| v. | Complaint and Jury Demand |
| TOWSON UNIVERSITY,<br>8000 York Road<br>Towson, Maryland 21252 | |
|     Defendant. | |

**COMES NOW** the Plaintiff, Victoria May, by and through the undersigned counsel, and for her cause of action states the following:

<u>**INTRODUCTION**</u>

1.      In July 2010, Plaintiff Victoria May (hereinafter "Plaintiff" or "Coach May") was hired by Towson University ("Towson") to serve as the head coach of the women's gymnastics team.

2.      On June 30, 2019, Coach May was terminated from Towson because of her gender, pregnancy, and in retaliation for reporting discrimination.

3.      Coach May now brings this action against Towson for gender and pregnancy discrimination and retaliation in her employment in violation of her rights under federal law (Title VII and Title IX).

4.      Coach May brings these claims to recover damages (lost wages and emotional distress) and to enforce equitable relief. Equitable relief includes reinstatement to her prior head

1

coaching position at Towson and changes to the policy and practice of Towson to reduce the impact of gender stereotypes that place female coaches, as well as male and female athletes, at risk.

5.     This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq*. (hereinafter "Title VII") and under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. (1982) (hereinafter "Title IX").

6.     Title VII protects employees from gender-based discrimination in the terms and conditions of their employment.

7.     Title IX prohibits sex discrimination in education and related activities, and it applies to claims of sex discrimination in certain employment, including coaches, administrators, and academics. 20 U.S.C. § 1681; 34 C.F.R. part 106, Subpart E.

### JURISDICTION AND VENUE

8.     Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 42 U.S.C. § 2000e-5(f)(3).

9.     Venue exists in this Court, as the events giving rise to this lawsuit occurred in Towson, Maryland.

10.     Coach May timely filed a discrimination charge against Defendant Towson on February 28, 2020 with the Equal Employment Opportunity Commission.

11.     The charge alleged, inter alia, that Defendants discriminated against her and terminated her employment due to her gender and pregnancy and in retaliation for reporting gender and pregnancy discrimination.

12.     The U.S. Department of Justice – Civil Rights Division issued a Notice of Right to Sue dated June 2, 2021. This action is being brought within 90 days from the issuance of the Notice of Right to Sue.

<u>**PARTIES**</u>

13.     Plaintiff Victoria May, a woman, is a resident of Auburn Indiana.

14.     Coach May is a former employee of Defendant Towson University, in Towson, Maryland.

15.     Defendant Towson University is a constituent institution of the University System of Maryland and is an agency of the State of Maryland.

16.     Towson, a public university, is an educational institution receiving federal financial assistance.

17.     Towson was the "employer" of Coach May as defined by Title VII.

<u>**STEREOTYPE AND BIAS RISK; STATUTORY PROTECTIONS**</u>

**Risks of Gender Stereotypes**

18.     A female is expected to behave in a manner that is consistent with societal stereotypes about females.

19.     Societal expectations of females include that they identify with the role of family caretaker/nurturer, not the role of "leader," such as a head coach.

20.     The role of leader, or head coach, was designed and remains defined as a "male-type" task. Coaching behavior is, therefore, supposed to be consistent with our expectations of how a male should behave, not a female. The fact that leader/head coach positions remain associated with male-type tasks or behavior resulting from stereotypes, is confirmed by social science.[1]

---

[1] Burton, Laura J., *Underrepresentation of Women in Sport Leadership: A Review of Research*, Sport Mgmt. Rev., Elsevier, vol. 18(2), pp. 155–165 (2014).

21.     These expectations or stereotypes about the roles of females create what is called a "lack of fit" or "role incongruity" when women hold high-level positions such as administrator or head coach.

22.     This lack of fit leads students, parents, and administrators to evaluate the behavior of female coaches differently than they evaluate the behavior of male coaches. This risk of gender stereotyping also exists regardless of whether the athlete is male or female.[2]

23.     As a result of stereotypes, a female coach who behaves in a stereotypically feminine manner is blamed for being too soft as a coach. A female coach who behaves in the manner in which we expect head coaches to behave (i.e., male-type tasks and behavior) is often blamed for being too harsh.

24.     Males are not similarly evaluated based on this double standard.

25.     The double standards, "lack of fit" or stereotypes, often result in student-athlete complaints against female coaches.

26.     These student-athlete complaints occur despite the fact that female coaches are not coaching any differently, and certainly no more harshly, than male coaches.

**Segregation of Women's Sports/Leadership Roles as Evidence of Stereotype**

27.     Women remain, disturbingly, effectively segregated in college athletics.

---

[2] "Qualitative research has reported that 8 out of 12 collegiate female athletes (basketball, softball, golf, cross-country, track and field and soccer) also preferred a male coach." Fisher *et al.*, *Attitudes Toward and Preferences for Male and Female Personal Trainers*, International Journal of Exercise Science, Vol. 6(4) p. 257 (2013). *See also* Fasting, K. & Pfister, G., *Female and male coaches in the eyes of female elite soccer players*. Eur. Physical Educ. Rev. 6(1); 91–110 (2000); Frankl, D.  & Babbitt, D.G., *Gender bias: a study of high school track and field athletes' perceptions of hypothetical male and female head coaches*. J. Sport Behavior 21; 396–407 (1998); Frey, M., Czech, D.R. *et al.*, *An exploration of female athletes' experiences and perceptions of male and female coaches*, The Sport J. 9(4) (2006).

28.     Statistics show that 97% of men's teams are coached exclusively by men and men serve as head coaches of 55% of women's teams.[3]  Nationally, with the exception of more co-ed sports such as track and field and golf. Women are permitted to coach only 25% of women's teams (men are head coaches on 75% of women's teams), and men also hold 48% of assistant coaching jobs on women's teams.

29.     At Towson, all 6 men's teams are coached by males and 5 of the 13 women's teams are coached by males.

30.     The gender segregation in college athletics is not "separate but equal," but rather a more offensive form of one-way segregation that gives men exclusive, complete access to coaching men, and disproportionate access to coaching women.[4]

31.     The segregation of sport in this way is a direct reflection of gender biases that presume women cannot or should not coach men and that presume that male athletes, because of gendered socialization, would never accept a female coach.

32.     The support of segregation in sports by any university is direct evidence that gender stereotypes are present and that the university embraces gendered differences in how athletes prefer to be coached.

---

[3] As of 2014, the data showed that 57.1% of women's teams are coached by males and 97% of men's teams are coached by males. Acosta and Carpenter, *Women in Intercollegiate Sport* (2014).

[4] "Imposing sex segregation on sports is problematic for many reasons. Sex segregation reflects and reinforces a binary view of both sex and gender unsupported by science. It communicates that women are physically unable to compete against men, even though research indicates considerable variation among individual athletes and different sports, and further reveals that attributes other than sex are often more important determinants of athletic ability. It reinforces unfounded gender stereotypes that harm both women and men. And sex segregation uncritically prioritizes athletic activities involving strengths typically associated with male bodies, without requiring us to ask why we view these strengths as the most important in the first place." Leong, *Against Women's Sports*, Washington University Law Review, Vol 95:1 (2018).

33.     Regardless of physical differences between male and female athletes, there is no reason (other than gender stereotypes) for a university to exclusively recruit and hire men to coach men while permitting men to hold coaching positions on women's teams.[5]

34.     Continued, one-way segregation of women is strong evidence of gender stereotypes within each university and, if not addressed, will continue to exacerbate existing gender stereotypes that harm women like Coach May.[6]  It is prohibited by Title IX.  *See* 34 C.F.R. § 106.51(a).

**Gendered Socialization Differences**

35.     Gendered socialization refers to the differences in how we raise young men and women to report their emotional responses to perceived risks of emotional or physical harm.

36.     We often socialize young women to report emotion and risk more openly to each other, to parents, and to other third parties, while we often socialize young men to refrain from reporting such emotions or risks.

---

[5] "Based on our results and other findings (e.g., Berri et al. 2009) that have examined the impact of head coaches on teams' and players' performances, it appears that both men and women are readily equipped for success in the coaching profession (and in some cases, women coaches have been more successful than the male coaches they replace; Aicher and Sagas 2010). As such, our results imply that the absence of women coaches for men's teams is not grounded in any objective or reliable evidence."  Darvin, L., Pegoraro, A., & Berri, D*., Are Men Better Leaders? An Investigation of Head Coaches' Gender and Individual Players' Performance in Amateur and Professional Women's Basketball*, Sex Roles, 78:455–66 (2018).

[6] "Cunningham and Sagas (2008) found not only that women have less access to positions as head coaches, but also that when women are able to obtain these positions, they are not treated with the same level of respect that their male colleagues are afforded. Processes such as these reinforce the subconscious formation of leadership stereotypes and serve to perpetuate sport as a gendered space. These stereotypes often exist despite a lack of evidence and objective measurements of coaching performance." *Id*.

37.     The differences in the amount, type, or manner of reporting feelings or emotional risk does not mean men and women *feel* emotion or worry differently or that men or women are stronger or weaker than the other.

38.     Male and female athletes will often choose to express feelings (fear, concern, worry, doubt, insecurity, etc.) that are a normal part of being a young adult and/or a collegiate athlete in different ways, even if the emotions they feel, as men and women, are similar.

39.     As a result of these gendered socialization differences, coaches of female programs often receive more student-athlete complaints compared to coaches of male programs, regardless of whether the coach is behaving any differently than coaches of male programs.

40.     Prior to terminating Coach May, Towson experienced these differences in the manner of how athletes on male teams may choose to complain or prefer not to complain compared to athletes on female teams.

41.     Towson has several outlets for student athletes to report concerns about coaching, including all-sport surveys, exit interviews, a formal student-grievance process, and informal verbal or written complaint channels (e.g. reports to staff, administration, academic advisors, etc.).

42.     As a result of gendered socialization, educational institutions also respond differently to student athletes based on the student's gender.

43.     Universities will often only respond to complaints made in a certain way or using a certain vehicle—written or emailed complaints or other methods used more often by women. Universities often will not review, react or respond to the manner of complaints used more often by males—such as reporting their concerns in anonymous all-sport surveys or making less direct complaints to counselors or academic advisors.

44.     As a result of the gendered approach to student complaints, universities often end up taking a patronizing response to concerns raised by female athletes, while effectively ignoring or overlooking male athletes who raise complaints about legitimate concerns.

45.     A female coach who engages in normal coaching behavior will be evaluated differently (and less favorably) than any male coach who engages in that same normal coaching behavior.

46.     A female athlete who has a negative response to *normal coaching behavior* is more likely to report this response to parents or to administration, and the university is more likely to react to that report by taking action.

47.     Athletes who report emotional responses to normal coaching behavior will often label that behavior as harmful by using words like bully, abuse, isolation, fear or harassment.

48.     The labels used by athletes who report coaching behavior of female coaches are most often reflecting the differential evaluation of the female coach's behavior, not reporting objectively problematic coaching methods.

49.     When a report is made about the behavior of a female coach, it is more likely that a university will fault the female coach than it would fault a male coach for engaging in the same behavior.

50.     Because of gender stereotypes and gendered socialization, a university (through administrators or investigators) will fault the female coach in at least two ways.

    a.   The university will fault the female coach for the *mere fact that the athletes claim to be harmed or feel negative emotion.*

    b.   The university will more quickly, and with less evidence, fault the female coach for any mistake, act of poor judgment or out-of-context comment.

51.     The result is that a complaint applying a label to a female coach (e.g., "bully") becomes more easily believed and more easily results in blame/fault placed on the female coach with less evidence.

52.     Complaints about the behavior of Coach May were created in part because of gendered socialization and in part because of the differential gendered expectations placed on them as female coaches.

53.     Any of these biases and stereotypes—relying on biased student-athlete complaints against coaches, treating the complaints of female athletes differently than those made by male athletes, or holding female coaches to double standards—are forms of gender discrimination that violate the purpose and scope of Title VII and Title IX.

54.     If any complaints about Coach May were the result of gender differences in how athletes complain or gender stereotypes, that cannot form a basis to evaluate or terminate them from their employment.

55.     She was held to a double standard in how she was permitted to interact with female athletics.

56.     She was expected to coach as a professional, but not permitted to coach like male coaches.

57.     Female student athletes are supposed to be permitted to play and compete like males, but administration does not treat them in the same way as male athletes.

58.     Because of the segregation of women's sports, gender stereotypes and gendered socialization, women are treated differently at all levels of college athletics and Coach May seeks to challenge how her gender and gender stereotypes about her and other women affected in her career and the decision to terminate her at Towson.

59.     It was clear that females can and do hold other females to the same double standards in college athletics.

**Interrelation of Relevant Statutes**

60.     Title VII forbids discrimination because of sex against any individual in hiring or "with respect to [their] compensation, terms, conditions, and privileges of employment . . . ." 42 U.S.C. § 2000e2(a)(1). Title VII also makes it an unlawful practice for an employer "to limit, segregate, or classify . . . employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [their] status as an employee . . . ." 42 U.S.C. § 2000e2(a)(2).

61.     Title IX prohibits sex discrimination in educational programs and activities receiving federal financial assistance, and also applies to a claims of sex discrimination in employment.

62.     Title IX applies to the employment of coaches, administrators, and academics and states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681.

63.     Title IX regulations specific to employees were promulgated by Congress. See 34 C.F.R part 106, Subpart E. *See also N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 512 (1982) (noting that "subpart E regulations promulgated in connection with Title IX are valid").

64.     The U.S. Department of Education also adopted guidance interpreting Title IX to cover and protect employees of educational institutions. See Title IX Resource Guide, available at https://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.

65.     Title IX's legislative history makes clear that Title IX's gender discrimination prohibition applies to the employment of coaches, administrators, and academics. *See* Simpson, Lynda Guild, *Sex Discrimination in Employment under Title IX*, U. Chi. L. Rev. Vol. 48: Issue 2, Article 8.[7] *See also* 14 C.F.R. § 1253.500(a) and 34 C.F.R. § 106.51(a) ("No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient that receives Federal financial assistance.").

66.     Title IX regulations make clear that Title IX's gender discrimination prohibition applies to Defendant's employment decisions including, but not limited to, decisions regarding hiring, promotion, consideration for and award of tenure, demotion, rates of pay or any other form of compensation, and changes in compensation. 14 C.F.R. § 1253.500(b)(1)–(10), 34 C.F.R. § 106.51(b)(1)–(10).

67.     Courts have held that subjecting an individual to sex stereotyping constitutes sex discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989).  The Supreme Court explained:" In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be, for example, aggressive, has acted on the basis of gender."[8]*Id.*

68.     Sex stereotyping also violates Title IX's prohibition of discrimination on the basis of sex. (U.S. Depart. of Justice – Title IX Legal Manual).

---

[7] Available at: https://chicagounbound.uchicago.edu/uclrev/vol48/iss2/8.
[8] Gender stereotyping has been fully recognized in the Fourth Circuit: *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 303-04 (4th Cir. 2019) recognizing sex stereotyping and applying the *Price Waterhouse.*

<u>STATEMENT OF FACTS</u>

**Employment History of Victoria May**

69.     Coach May was hired as the head coach for women's gymnastics at Towson in July 2010.

70.     Prior to serving as head coach at Towson, Coach May spent 5 years as an Assistant Coach at the University of Maryland, where she earned EAGL Assistant Coach of the Year honors in 2010.

71.     In her 9 years at the helm of the program, Coach May and her team excelled, as evidenced by:

    a.  2017 – Coach May was named Southeast Regional Head Coach of the Year by the National Association of Collegiate Gymnastic Coaches for Women;
    b.  2017 – 4 gymnasts selected for NCAA regional competition;

    c.  2015 – 3rd-place finish at East Atlantic Gymnastics League (EAGL) championship, the highest post-season finish since 2001;

    d.  2015 – Coach May selected as EAGL Coach of the Year;

    e.  2012 – Team posted a 20-5 record and finished second at the Eastern College Athletic Conference (ECAC) Championship;

    f.  2011 – Team posted an 18-1 record and won team titles at three Invitationals;

    g.  2011 – Coach May named ECAC Coach of the Year.

72.     Throughout her career, Coach May received overwhelmingly positive performance evaluations, including in her last performance evaluations, which was conducted on or about April 25, 2018, by Coach May's Sport Administrator Jon Dahlquist.

73.     Shortly after the performance evaluation, Mr. Dahlquist and Coach May had one of their regularly bi-weekly meetings.

74.     At the end of the meeting, Mr. Dahlquist mentioned that some of the senior gymnasts had raised concerns with him and asked Coach May to respond to those concerns.

75.     The concerns included, for instance, nutrition for the team, Coach May being on her cell phone during practices, and a complaint that the team had been required to record home workouts over the summer and post them to YouTube as a way to ensure the workout assignments were being completed.

76.     Coach May provided her explanation of the events.

77.     She provided full explanation of how the team meals were provided and explained the team was always provided with proper nutrition for competitions.

78.     She explained that she was required to take phone calls from her doctors and attend extra doctor's appointments due to the fact that she had suffered three recent miscarriages and required fertility treatment and testing for the same.

79.     She further explained that the team was never left unattended while she took these calls or attended these appointments, as the assistant coach and Athletic Trainer were there.

80.     Finally, she explained that the YouTube assignments had been given to the team by the team captains without knowledge Coach May's direction or knowledge.

81.     By the end of the meeting, Mr. Dahlquist seemed satisfied with Coach May's explanations and gave no indication that there was any reason to be concerned about the complaints from the student athletes.

82.     However, weeks later in June 2018, Coach May received a memo from Human Resources formally disciplining her for the same concerns raised by the senior gymnasts.

83.     Going forward, she was instructed to not leave the practice area except for an emergency.

84.    She was instructed to not take cell phone calls during practices.

85.    To Coach May's knowledge, she was the only coach at Towson given these types of instructions.

86.    As a result of these instructions, and knowing that she would require time off for necessary doctor's appointments, Coach May inquired with her Sports Supervisor Geoff Gordon as to the best course of action.

87.    Mr. Gordon agreed that the best course of action was for Coach May to inform Mr. Gordon of all appointments so he could formally approve time off.

88.    Again, to Coach May's knowledge, no such thing was required of any other coach.

89.    At no time prior to Coach May disclosing that she was requiring extra time and phone calls due to her recent miscarriages and fertility efforts, had Coach May ever been instructed that she was required to be in the gym for all practices.

90.    Nor would such an instruction have made sense, as numerous essential duties, such as recruiting, would result in the assistant coach supervising practices, along with the Athletic Trainer being present and covering as the sports medicine protocol states.

91.    Furthermore, to her knowledge, there is no such Towson Athletics policy stating that an athletic practice cannot occur without the presence of the head coach.

92.    Had Towson conducted even a cursory investigation into the complaints raised by the seniors, it would have been clear that Coach May had done nothing wrong and should not have been disciplined.

93.    For instance, the HR Memo noted that the athletes had raised concerns about how Coach May responded to a media inquiry about two injured athletes.

94.     That interview was (and is) available on YouTube and a simple review of the video would have revealed Coach May did not say or do anything inappropriate or in violation of university policy.

95.     The Memo also suggested that Coach May violated the university's nepotism policy by having her husband travel with the team.

96.     Coach May had previously inquired with Mr. Dahlquist if her husband would be permitted to travel with the team as he did not have any duties or responsibilities.

97.     Mr. Dahlquist gave permission for him to travel with the team, as is often done for family members of other coaches.

**Retaliation**

98.     Concerned that her gender and/or pregnancy might be playing a role in the complaints and discipline she was receiving, Coach May reached out to counsel to obtain assistance in addressing her concerns.

99.     Her counsel sent a letter to Towson on or about September 20, 2018, which explained the risks that gender biases were affecting the evaluation of Coach May's coaching methods and affecting Towson's disciplinary decisions in response.

100.    Coach May also provided a detailed rebuttal to each allegation in the HR Memo.

101.    In the fall of 2018, Coach May hired an outside consultant to help both her and the team improve communication.

102.    In approximately September 2018, this consultant conducted an anonymous survey of all of Coach May's gymnasts.

103.    The responses were generally positive and no athlete expressed any significant concerns.

104.    In the winter of 2018, one of Coach May's student athletes was having significant disciplinary issues.

105.    Towson administrators were aware of these disciplinary issues and approved all disciplinary actions Coach May imposed with this student athlete.

106.    On February 5, 2019, Coach May was informed that this student athlete (along with a former athlete who was one of the seniors who had complained earlier in the year), had filed a complaint accusing Coach May of racial discrimination toward them. Both of these student athletes are African American.

107.    She was told that she was being put on paid administrative leave, effective immediately, while the university conducted an investigation.

108.    It should be noted that a male strength and conditioning coach had been accused of sexual assault by a student athlete in late 2018 or early 2019, and he was never put on leave while the university investigated.

109.    On February 15, 2019, Coach May's counsel again provided correspondence to Towson explaining why the complaints against Coach May (and Towson's reaction to the complaints) was due to gender bias and stereotypes.

110.    On April 23, 2019, Coach May received a letter from Towson informing her that OIIE had completed its investigation into the complaints raised against her.

111.    The letter included a summary of the finding, all of which exonerated Coach May from any wrongdoing.

112.    Of particular note, the summary included this statement:

> Some witnesses did seem to indicate that they believed the Reporting Parties were treated differently because of their race. However, student athletes are not privy to private information related to injuries or conversations that occur between coaches, athletic staff, and athletes. Because of this, assumptions are

often made without all the facts related to the situation. Often witnesses state something seemed unfair or that either [Student Athlete A] or [Student Athlete B] were treated differently, but did not have the facts of what actually occurred, and were only given pieces of information based on the perceptions of the athletes or gossip.

113.   The investigation ultimately cleared Coach May of *any* wrongdoing.

114.   On May 3, 2019, Coach May met with AD Tim Leonard and HR representative Tara Richards.

115.   At this time, Coach May was 8 months pregnant. The last time AD Leonard saw Coach May, she was not visibly pregnant and she had not informed him of her pregnancy.

116.   During the meeting, Coach May was informed that since the investigation cleared her of wrongdoing, she would be brought back to coaching the team starting the following Monday and that they planned to renew her contract for another year.

117.   Coach May then asked what support she would receive from administration to help her transition back to the team.

118.   She told AD Leonard and Ms. Richards that male coaches have not been treated the way she was treated in this investigation.

119.   AD Leonard's response was to advise her to recruit less "overly sensitive" athletes to help eliminate some of the "unnecessary negative energy that is occurring."

120.   He then noted that the men's basketball coach had similar problems until he changed his recruiting requirements.

121.   AD Leonard then told Coach May that she was being "aggressive."

122.   Meanwhile, the men's basketball coach is widely known to verbally berate his student athletes, including using such phrases as "motherfucking cocksuckers."

123.    Upon information and believe, this coach's behavior led to administrators expressing concerns that season ticket holders were seated close enough to the sidelines that they could hear the inappropriate language used.

124.    Hours after the meeting ended, Coach May received a call from Ms. Richards saying that they would not bring Coach May back on Monday; instead, they would take more time to work out a smoother transition for her return.

125.    On May 7, 2019, Coach May's Sports Supervisor Geoff Gordon e-mailed Coach May asking her to meet with AD Leonard the next day.

126.    On May 8, 2019, Coach May met with AD Leonard and SWA Tricia Brandenburg, where she was informed that she was being fired and that her employment would effectively terminate at the end of June.

127.    Coach May was given until June 30, 2019 to return her keys and any other university property.

128.    Coach May cleaned out her office on the evening of May 9, 2019.

129.    On the evening of May 10, 2019, Coach May received a phone call from Towson University police informing her that someone had filed a complaint alleging that she had stolen university property.

130.    Coach May immediately went to the police station to give her statement.

131.    Coach May explained that she did not steal university property, nor was it possible for her to have stolen anything because she was not required to turn in university property until June 30, 2019.

132.    Those involved in filing the police report were aware that Coach May had until June 30, 2019 to turn in university property and, therefore, were aware that there was no basis for filing a police report.

133.    University police confirmed to Coach May that there was no basis to the complaint and took no action against her.

134.    Coach May gave birth to her son on June 28, 2019.

135.    After firing Coach May, Towson hired a lesser qualified male, Jay Ramirez, as her replacement.

136.    Mr. Ramirez is less qualified because he had no collegiate head coaching experience at the time he was hired.

137.    Mr. Ramirez previously served as an assistant coach for Coach May and was nearly fired for performance issues.

138.    Despite these obvious shortcomings in qualifications, Mr. Ramirez's starting salary was higher than Coach May's salary at the time she was fired, after having served as Towson's head coach for 9 years.

**Failure to Follow Policy, Investigate, and Prevent Impact of Biased Complaints**

139.    Towson has policies that prohibit discrimination and protect employees from the effects of gender bias, gender stereotypes, and retaliation under Title VII and Title IX.[9]

140.    Towson understands and agrees that women, like Coach May, have a right to engage in the same job duties and/or use similar coaching methods as used by males.

---

[9] https://www.towson.edu/inclusionequity/titleix/?utm source=redirect&utm_content=titleix and https://www.towson.edu/about/administration/policies/06-01-00-policy-prohibiting_discrimination.html#:~:text=Towson%20University%20(%E2%80%9CTU%E2%80%9D)%20or,impedes%20equal%20access%20to%20any

141.    Towson is required by university policy and federal and state law to treat male and female athletes equally.

142.    Towson cannot, for example, require male athletes to submit to more severe foul language, punitive rules, management of weight/fitness, physically or emotionally stressful coaching methods, etc., than are applied to female athletes.

143.    Towson cannot have different coaching standards for males and females based on gender stereotypes regarding the amount of emotional or physical stress that an athlete can "take" when there is no objectively recognizable difference between them.

144.    Towson can account for objective physical differences in the process of physical training of athletes (e.g., weightlifting), but the university cannot make gender-stereotyped assumptions about what emotional or physical stress a woman can accept compared to a man.[10]

**Male Coaches at Towson Engage in Similar Coaching Methods and Are Retained**

145.    Towson employs several male coaches that have been coaching over several years and who have engaged in coaching methods and behavior that would be, at best, similar to, or at worst, more punitive than any coaching methods used by Coach May.

146.    Coach May was not permitted to coach in the same manner as male coaches and coaches of Towson men's teams including but not limited to: Mike Gottlieb; men's baseball coach from 1988–2017, Matt Tyner, men's baseball coach from 2018 to present; Pat Skerry; men's basketball coach from 2011-present, Rob Ambrose; men's football coach from 2009 to present, Brian Yaniger; men's golf coach from 2011-2017, Mike Larkin; men's golf coach from 2017-

---

[10] While it is unlikely that Towson would have any formal policy that suggests it should manage women and men differently or coach women and men differently, any such policy, (formal or otherwise) would be the antithesis of Title IX, which was put in place exactly to overcome such stereotyped views of women as athletes.

present, Shawn Nadelen; men's lacrosse coach from 2012 – present, Jake Shrum, men's swimming and diving coach form 2016-present.

147.    Given that it is typical for student athletes to complain about their coaches, it is likely that these long-term male coaches have received student-athlete complaints, yet they were not investigated (without an opportunity to rebut the complaints) and summarily terminated—in stark contrast to Coach May.

148.    Given the tenure of this group of long-term male coaches, each was permitted to coach their athletes, manage their programs, and dismiss athletes if necessary, and yet none of them have been terminated regardless of the number or seriousness of student-athlete complaints received concerning their coaching.

149.    Towson did not examine the source of complaints or concerns raised by male athletes, which would likely reveal that male coaches at Towson are using the same coaching methods as Coach May.

150.    Towson did not examine the indicators of stress on athletes coached by male coaches. Indicators of stress include academic success, transfer requests, cuts from the roster, exit interviews, all-sport student surveys, and information on the numbers of males seeking mental health counseling.

**Effects of Gender Bias and Socialization on Student-Athlete Complaints**

151.    Many of the allegations against Coach May merely used vague labels (e.g., the coach "bullied" or "targeted" players).

152.    Other allegations appeared to be specific, but were the product of gender stereotypes and the operation of bias that affects the perception of behavior, the interpretation of

that behavior, and even the discussion or transmission of that behavior between student athletes, to parents, and to administration.

153.     There are common complaints made by student athletes toward female coaches that include claims of discussions about weight/fitness or claims of "pressure to play injured".

154.     Both of these examples are quite common and are the result of the female coach not engaging on these issues or responding to these issues in a manner more consistent with her expected role of nurturer or caretaker. The response of the female coach does not "fit" the expectations of how she, as a female, is supposed to respond on these issues.[11]

155.     Towson knew or should have known that the allegations were driven by gender stereotypes based on the information readily available to any university and that was provided by Coach May through counsel.

156.     Towson knew that one purpose of its internal policy of investigation is to reduce the risk that stereotypes will affect complaints about a student or an employee.

157.     A thorough and unbiased investigation (e.g., comparing the reported behavior and language with that of male coaches, etc.) would have revealed the allegations to be either false, exaggerated, taken out of context, influenced by gender, and/or not a violation of rules or university policy.

158.     Towson failed to conduct an unbiased investigation and in fact, ignored the limited investigation performed that cleared Coach May and supported her continued employment.

---

[11] Hoyt, C., Simon, S., & Reid, L., *Choosing the best (wo)man for the job: The effects of mortality salience, sex, and gender stereotypes on leader evaluations*, The Leadership Quarterly 20(2), 233–46 (2009) ("The scientific study of sex differences in leadership began in the 1970s and remains a vigorous area of research. One facet of this research that generates consistent and robust findings is the prejudice against female leaders that results from the incongruency between gender stereotypes and the leadership stereotype.").

159.    At the time of her termination, Towson was aware that Coach May was following all university policies, was coaching the student athletes in a manner that was consistent with professional standards and university policy, and had engaged in no behavior that would justify her termination under University policy.

160.    Towson knew or should have known that the allegations were without merit and driven by gender bias based on information provided to the AD, university President, and in-house counsel.

161.    As a result of the fact and manner of her termination, Coach May lost the benefits of her coaching position, including lost income and benefits in the past and future.

162.    Coach May also has endured emotional distress resulting from her termination, continuing unemployment or underemployment, and the likely permanent loss of her coaching career.

## COUNT I

### Gender Discrimination and Retaliation in Violation of Title VII

163.    Coach May re-alleges all preceding paragraphs as if fully set forth herein.

164.    Coach May has satisfied all conditions precedent for bringing suit under Title VII.

165.    Under the provisions of Title VII, it is unlawful for an employer to discriminate against an employee on the basis of sex.

166.    At all material times, Defendants were Coach May's "employer" within the meaning of Title VII.

167.    Defendants discriminated against Coach May on the basis of gender in violation of Title VII.

168.     Defendant's failure to take affirmative steps to remove other barriers to equality, including the effective segregation of the employment, is evidence of the presence of gender stereotypes.

169.     In addition to pursuing her individual rights, Coach May seeks equitable relief to reduce the risks of gendered socialization harming female athletes and male athletes.

170.     Female athletes are entitled to a competitive experience equal to that of male athletes. The termination of a female coach for engaging in coaching methods that are the same as those used by male coaches undermines that competitive experience.

171.     Male athletes are entitled to have their concerns about improper coaching noticed and investigated despite the fact that males are less comfortable making complaints about their coaches or their experience.

172.     Towson has indications that male athletes attending Towson have experienced negative physical and emotional responses to the coaching methods of male coaches. These indicators include, but are not limited to:

   a.   Complaints presented through all-sport surveys, exit interviews, to academic advisors or mental health counselors.

   b.   The number of males who seek mental health counseling.

   c.   The lower academic success of some male teams or male athletes.

   d.   The pressure to play in pain or risk future injury on male teams.

173.     The evidence of gendered socialization and gender stereotypes at Towson makes it likely that all these indicators of stress on male athletes are being ignored.

174.     Upon information and belief, Towson's failure to conduct a proper and unbiased investigation of the allegations made against Coach May is motivated, at least in part, by Coach May's sex. *Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019).

24

175.    Coach May engaged in protected activity when she informed AD Leonard and Ms. Richards that she was not being treated the same as male coaches.

176.    Towson fired Coach May less than one week after she made this complaint.

177.    Towson's termination of Coach May was retaliatory for Coach May's engagement in protected activity.

178.    On information and belief, in discriminating against Coach May, Defendant acted with malice or in reckless disregard of Coach May's rights and would be subject to punitive damages.

179.    As a result of Defendant's conduct, Coach May suffered loss of employment, loss of wages and benefits, emotional pain and suffering, anxiety, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out-of-pocket expenses.

180.    The actions of Defendants require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII including, but not limited to:

    a.  Reinstatement of Plaintiff to her position as head coach, or front pay:

    b.  The appointment of a special master to examine how complaints/concerns of student-athletes are received (verbal, email, all-sport survey, exit interview) and to ensure that all concerns of both men and women are processed equally.

    c.  The design and use of a student athlete grievance protocol for current athletes and a mandatory injunction requiring that complaints about current employees from non-employees be processed according to Towson's policy on investigations.

    d.  Training for the coaches and staff of the athletic department on the risks of gendered socialization and stereotypes;

    e.  Training on gender bias for current and incoming student athletes and their parents; and

    f.  Such other and further relief as the Court deems necessary to effectuate the purposes of Title VII.

**WHEREFORE**, Coach May requests reinstatement; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of-pocket expenses; equitable relief; any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purposes of Title VII; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

**COUNT II**

**Gender Discrimination and Retaliation in Violation of Title IX**

181.    Coach May re-alleges all preceding paragraphs as if fully set forth herein.

182.    Coach May has satisfied all conditions precedent for bringing suit under Title IX.

183.    Under the provisions of Title IX, it is unlawful for an employer to discriminate against an employee on the basis of sex.

184.    At all material times, Coach May was an "employee" within the meaning of Title IX.

185.    Defendants discriminated against Coach May on the basis of gender in violation of Title IX.

186.    Defendants also violated Title IX because they failed to ensure equal treatment for female athletes, female programs, and by extension, female coaches of female athletes and female programs.

187.    Defendant's failure to take affirmative steps to remove other barriers to equality, including the effective segregation of the employment, is evidence of the presence of gender stereotypes.

188.    In addition to pursuing her individual rights, Coach May seeks equitable relief to reduce the risks of gendered socialization harming female athletes and male athletes.

189.    Female athletes are entitled to a competitive experience equal to that of male athletes. The termination of a female coach for engaging in coaching methods that are the same as those used by male coaches undermines that competitive experience.

190.    Male athletes are entitled to have their concerns about improper coaching noticed and investigated despite the fact that males are less comfortable making complaints about their coaches or their experience.

191.    Because Towson is bound by Title IX, it must maintain records of the athletic experience including all-sport surveys, exit interviews, the numbers of athletes who seek mental health counseling, the academic performance of athletes, and the numbers of athletes who leave the team or transfer to another school.

192.    Towson also has policies that permit athletes to report concerns to the Title IX Coordinator, HR, an academic advisor, or a counselor.

193.    Towson has indications that male athletes attending Towson have experienced negative physical and emotional responses to the coaching methods of male coaches. These indicators include, but are not limited to:

   e.   Complaints presented through all-sport surveys, exit interviews, to academic advisors or mental health counselors.

   f.   The number of males who seek mental health counseling.

   g.   The lower academic success of some male teams or male athletes.

   h.   The pressure to play in pain or risk future injury on male teams.

194.    The evidence of gendered socialization and gender stereotypes at Towson makes it likely that all these indicators of stress on male athletes are being ignored.

195.    Upon information and belief, Towson's failure to conduct a proper and unbiased investigation of the allegations made against Coach May is motivated, at least in part, by Coach May's sex. *Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019).

196.    Coach May engaged in protected activity when she informed AD Leonard and Ms. Richards that she was not being treated the same as male coaches.

197.    Towson fired Coach May less than one week after she made this complaint.

198.    Towson's termination of Coach May was retaliatory for Coach May's engagement in protected activity.

199.    As a result of Defendant's conduct, Coach May suffered loss of employment, loss of wages and benefits, emotional pain and suffering, anxiety, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out-of-pocket expenses.

200.    The actions of Defendants require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title IX including, but not limited to:

g.   Reinstatement of Plaintiff to her position as head coach, or front pay:

h.   The appointment of a special master to examine how complaints/concerns of student-athletes are received (verbal, email, all-sport survey, exit interview) and to ensure that all concerns of both men and women are processed equally.

i.   The design and use of a student athlete grievance protocol for current athletes and a mandatory injunction requiring that complaints about current employees from non-employees be processed according to Towson's policy on investigations.

j.   Training for the coaches and staff of the athletic department on the risks of gendered socialization and stereotypes;

k.   Training on gender bias for current and incoming student athletes and their parents; and

l.   Such other and further relief as the Court deems necessary to effectuate the purposes of Title IX.

**WHEREFORE**, Coach May requests reinstatement; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of-pocket expenses; punitive damages, equitable relief; any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purposes of and Title IX; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

## COUNT III

### Pregnancy Discrimination in Violation of Title VII

201.    Coach May re-alleges all preceding paragraphs as if fully set forth herein.

202.    Coach May has satisfied all conditions precedent for bringing suit under Title VII.

203.    Under the provisions of Title VII, it is unlawful for an employer to discriminate against an employee on the basis of pregnancy.

204.    Defendants discriminated against Coach May on the basis of her pregnancy and pregnancy-related medical issues in violation of Title VII.

205.    Specifically, Defendant violated Title VII in unlawfully terminating Coach May after becoming aware of her pregnancy and denying her equal terms and conditions of employment.

206.    On information and belief, in discriminating against Coach May, Defendant acted with malice or in reckless disregard of Coach May's rights and would be subject to punitive damages.

207.    As a result of Defendant's conduct, Coach May suffered loss of employment, loss of wages and benefits, emotional pain and suffering, anxiety, humiliation, embarrassment, inconvenience, damage to her reputation, loss of career, and out-of-pocket expenses.

**WHEREFORE**, Coach May requests reinstatement; lost wages and benefits; compensatory damages for loss of employment, loss of wages and benefits, emotional pain and suffering, mental anguish, humiliation, embarrassment, inconvenient and damage to her reputation, and out-of-pocket expenses; punitive damages, equitable relief; any other relief the Court deems just and necessary; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

## **JURY DEMAND**

Plaintiff, Victoria May hereby requests a trial by jury in the above-captioned matter on all matters triable to a jury as a matter of right.

/s/Omar Vincent Melehy
Omar Vincent Melehy
Melehy & Associates LLC
8403 Colesville Road, Suite 610
Silver Spring, Maryland 20910
Email: ovmelehy@melehylaw.com
Email: abalashov@melehylaw.com
Phone: 301-587-6364
Fax: 301-587-6308

Thomas Newkirk, *seeking pro hac vice admission*
tnewkirk@newkirklaw.com
NEWKIRK ZWAGERMAN, P.L.C.
521 East Locust Street, Suite 300
Des Moines, IA 50309
Telephone: (515) 883-2000
Fax: (515) 883-2004

Danya Keller, *seeking pro hac vice admission*
dkeller@newkirklaw.com
NEWKIRK ZWAGERMAN, P.L.C.
521 East Locust Street, Suite 300
Des Moines, IA 50309
Telephone: (515) 883-2000
Fax: (515) 883-2004

ATTORNEYS FOR PLAINTIFF